**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 24-14041-CR-GRAHAM/MAYNARD**

**UNITED STATES OF AMERICA,**

**v.**

**JOSEPH ACEVEDO and**
**STANLEY RUMOWSKI,**

      **Defendants.**
_____/

**<u>OMNIBUS REPORT AND RECOMMENDATION ON</u>**
**<u>DEFENDANTS' MOTIONS TO SUPPRESS (DE 32, 35)</u>**

      Defendants Joseph Acevedo and Stanley Rumowski ("Defendants") are charged by Indictment with conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846 (Count 1), possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) (Count 2), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3).  DE 1.  Both Defendants filed motions to suppress seeking to exclude all physical evidence seized from a warrantless search of the vehicle in which they were traveling.  DE 32, DE 35.  Mr. Acevedo's motion further seeks to suppress all evidence stemming from Mr. Acevedo's post-arrest statements and the search of his Galaxy S22 cell phone.  DE 35.  The Government opposes both motions.  DE 37, DE 42.

      The motions to suppress have been referred to me for a Report and Recommendation.  DE 39.  For the following reasons, I find that the challenged evidence is not subject to suppression under Fourth Amendment jurisprudence.  I thus respectfully recommend that both motions be **DENIED**.

## EVIDENTIARY HEARING

I held an evidentiary hearing on June 6, June 17, and June 18, 2024.[1]  On June 6, 2024, the Government presented testimony from Detective Alex Mercado from the Martin County Sheriff's Office ("MCSO") regarding Acevedo's Mirandized statement and the search of his Galaxy S22 cell phone.  DE 60.  The Government introduced Mr. Acevedo's audio recorded post-arrest statement (Govt. Ex. 1) and a Consent to Search Form signed by Mr. Acevedo (Govt. Ex. 2).  DE 58.

On June 17 and 18, 2024, the Government presented testimony from MCSO Deputy Collin Corley regarding the stop and search of Defendants' vehicle.  DE 67.  The Government introduced various photographs (Govt. Exs. 3-22); MCSO Computer Assisted Dispatch ("CAD") Reports (Gov. Ex. 23); and MCSO Deployment Reports for K-9 Loki (Govt. Ex. 24).  Mr. Rumowski introduced Loki Deployment Reports (Def. Ex. A); CAD Reports (Def. Ex. B); Photograph: I-95 and Overpass (Def. Ex. C); Loki K-9 Training Reports (Def. Exs. D-F); Aerial Video from Pole Camera (Def. Ex. G); Dash Cam Video (Def. Ex. H); State of Florida v. Nicholas Garofalo Docket and Arrest Report (Def. Ex. J).[2]  Mr. Acevedo introduced Acevedo's Arrest Affidavit (Def. Ex. I).

## FINDINGS OF FACT

The following findings of fact are based on the evidence and witness testimony presented at the evidentiary hearing, as well as my review of the exhibits.  My factual findings are based, in part, on credibility determinations, after observing all the witness testimony together with the other

---

[1] Final transcripts from all three hearing dates are complete.  However, to date, only the hearing transcript from June 6, 2024, has been filed in the record at DE 60.  Citations to the transcript from this first hearing will be "DE 60 at __."  When citing to the other hearing transcripts that have not yet been filed, I will use the following citation forms: "June 17 Tr. at __" and "June 18 Tr. at__," respectively.

[2] Defense Exhibit G was introduced as surveillance taken from a helicopter; however, Deputy Corley clarified the video is from a pole camera, operated by a federal agency and MCSO no longer has access to it. June 18 Tr. At 26-27.  Although it was admitted into evidence, I do not find it particularly relevant, other than to show there may have been surveillance in the area before.

evidence presented.  Unless otherwise noted, I find that all the witnesses testified credibly.  *See U.S. v. Menendez*, 2000 WL 36733765, at \*1 (S.D. Fla. Oct. 2, 2000) ("Rulings on motions to suppress involve mixed question of law and fact … [One] issue of fact … [is] the credibility of the witnesses.").

### A.      Stop and Search of Defendants' SUV.

On December 1, 2022, Deputies Collin Corley and Zachary Ferreira were parked in an unmarked K-9 vehicle, underneath an overpass on Interstate 95 northbound, near the exit for Highway 714 in Martin County, Florida.  June 17 Tr. at 19.  The deputies were part of an Interdiction Strike Force comprised of state and local law enforcement investigating human, drug, and firearm trafficking throughout the state of Florida.  DE 32 at 5, DE 35 at 5.  Deputy Corley was assigned to the operation as a K-9 handler.  *Id*. at 16.  To identify persons engaged in possible illegal activity, law enforcement placed marked police vehicles and digital signs along the northbound lanes of I-95 claiming that a drug checkpoint was ahead.  *Id*. at 60-61.  In fact, there was no drug checkpoint on I-95.  The point of the signs was to prompt drivers engaged in illegal activity to exit I-95 before reaching the checkpoint to avoid being searched by law enforcement.[3] Once drivers exited I-95, police stationed under the nearby overpass near Highway 714 watched for traffic violations so they could stop the cars to investigate for trafficking activity.

At approximately 9:17 p.m., Defendants' SUV exited I-95 at the Highway 714 exit.  Parked under an overpass west of the exit, Deputy Corley observed the SUV get into the left lane meant for westbound travel and then make an eastbound (right) turn onto Southwest Martin Highway

---

[3] Deputy Corley admitted that the drug checkpoints are not real, and claimed to not know what their purpose is.  June 17 Tr. at 110.  However, the Government's briefing indicated that the fake checkpoint signs are used to "recognize suspicious patterns of behavior" and to "lure motorists toward officers conducting traffic enforcement operations."  DE 37 at 2, 41 at 2.  Ultimately, I do not find Deputy Corley's testimony that he did not know the purpose of the checkpoint to be credible.

without stopping at a stop sign.  *Id*. at 20, 25.  Deputy Corley followed the SUV, which attempted to turn around at a residential development (Stuart West Cobblestone).  *Id*. at 33.  Deputy Corley activated his lights to initiate a traffic stop.  *Id*. at 35.  The SUV complied and pulled over.

 Using his spotlight, Deputy Corley approached the vehicle's driver side while Deputy Ferreira approached the front passenger side.  Rumowski was driving and Acevedo was in the front passenger seat.  Deputy Corley advised that he was stopping the car because it failed to stop at the stop sign.  Rumowski responded that he did not believe he ran the stop sign.  Deputy Corley obtained Rumowski's driver's license and asked Defendants where they were coming from. Rumowski replied that they were coming from Miami where they had been setting up an event. He further advised that the vehicle belonged to Acevedo's girlfriend.

Deputy Ferreira took Rumowski's license from Deputy Corley to check for warrants, confirm driver's license status, and write a warning.  While he was doing that, Deputy Corley instructed Defendants to get out of the vehicle and patted them down to check for weapons. Neither had weapons on them.  *Id*.  at 40.  Deputy Corley then retrieved his K-9 partner, Loki, from the patrol vehicle.  Loki is trained to detect cocaine, methamphetamine, heroin, and MDMA. *Id*. at 14, 107.  Loki is trained <u>not</u> to alert to the odor of marijuana.  Loki conducted an exterior sniff and alerted to the driver side area of the vehicle.  *Id*. at 45-51.  Based on Loki's alert, Deputy Corley searched the vehicle and discovered a loaded semiautomatic pistol in the driver side door compartment, $12,540 in U.S. currency, a scale, and rubber bands in the center console, and a "half brick" of cocaine (approximately 506.8 grams) in a backpack in the rear compartment behind the back passenger seat.  *Id*. at 53-58.  Deputy Corley secured the scene and waited for a supervisor to arrive.  *Id*. at 58.

According to the CAD reports, the deputies stopped Defendants' SUV at 9:17 p.m. and the firearm was located and inputted into the system at 9:38 pm. Gov. Ex. 23C; June 17 Tr. at 121-132. Thus, approximately 21 minutes passed between the stop and the search. Deputy Ferreira was still conducting background checks and writing the warning while Loki sniffed the vehicle.

There is no audio or video recording of the stop and search of the SUV.

### B. Mr. Acevedo's Mirandized Interview at the Scene.

MCSO Detective Alex Mercado and HSI Agent Joshua Miller arrived on the scene shortly thereafter. DE 60 at 13. When they arrived, Defendants' vehicle was pulled over in the exit lane of the Stuart West Cobblestone community and Defendants were standing outside of the vehicle. *Id*. at 10-12. Detective Mercado first spoke with the deputies, who explained what the search had revealed. *Id*. at 13. Detective Mercado then separated the Defendants by asking Mr. Rumowski to walk with him towards the entrance lane of the community. *Id*. at 14. After speaking to Mr. Rumowski, Detective Mercado turned to Mr. Acevedo and asked him to "come and talk to me." *Id*. at 14, 16.

Detective Mercado read Mr. Acevedo *Miranda* rights and recorded their conversation on his Samsung work phone. *Id*. at 17. Mr. Acevedo said he understood his rights and was willing to talk to Detective Mercado. *See* Gov. Ex. 1. During the conversation, both Detective Mercado and Agent Miller wore department-issued vests with duty belts that held their holstered weapons.[4] DE 60 at 17. Mr. Acevedo described where he had been that day, his tattoos, his relationship with Mr. Rumowski, their cannabis business, his move from Carol City to Fort Pierce, and his criminal

---

[4] Detective Mercado and Agent Miller's weapons were holstered at both the roadside interview and during the interview at MCSO. *Id*. at 17, 28.

history.[5]  *Id*. at 18-19; Gov. Ex. 1.  At some point in the conversation, Mr. Acevedo told Detective

Mercado where his phone was located in the car, and a deputy recovered it.  DE 60 at 19.  After

the phone recording was stopped, Mr. Acevedo indicated that he wished to speak with law

enforcement out of Mr. Rumowski's earshot because he had previously been a confidential

informant for law enforcement.  *Id*. at 20.   Mr. Acevedo expressed interest in working with law

enforcement, but no promises were made to Mr. Acevedo regarding cooperation.  *Id*. at 31.  After

30 to 45 minutes of conversation and attempting to get preliminary details about Mr. Acevedo's

work as a confidential informant, law enforcement handcuffed Mr. Acevedo and transferred to

Martin County Sheriff's Office.  *Id*. at 20-21, 31-32.

### C.   Mr. Acevedo's Interview at the Sheriff's Office and Consent to Search his Cell Phone.

At the Sheriff's office, Mr. Acevedo was placed in an interview room, where the

conversation continued with Detective Mercado and Agent Miller.[6]  *Id*. at 23.  The interrogation

room door was left open, Mr. Acevedo's cuffs were removed, and he was offered water.  *Id*.  Mr.

Acevedo made a statement, elaborating on "things" he had done as a confidential informant for

other law enforcement departments and agencies.  *Id*. at 11-14, 23.  Mr. Acevedo asked to be

released immediately in exchange for his cooperation.  *Id*. at 24-25.  Because the cooperation

information Mr. Acevedo was describing did not relate to Martin County, he was primarily

speaking to Agent Miller, who was unable to verify the information Mr. Acevedo provided.  *Id*.

at 23-24.  Detective Mercado gave Mr. Acevedo a consent to search form so law enforcement

---

[5] Prior to the stop, neither Detective Mercado or Agent Miller was aware of Mr. Acevedo's criminal history and neither
had run his information in their systems.  *Id*. at 18.

[6] According to Detective Mercado, the MCSO interrogation room typically has audio and visual recording capacity,
however on December 1, 2022, it was not working.  *Id*. 43:11-12. Detective Mercado also noted that information from
confidential informants is not usually recorded for the safety of the information and verification purposes.  *Id*. at 23.

could search his phone.  Detective Mercado explained what the form was but did not read it out

loud to Mr. Acevedo.  *Id*. at 33.  Detective Mercado gave Mr. Acevedo an opportunity to read the

form, which Acevedo did in front of Detective Mercado.  *Id*.   The consent to search form stated:

I, __JOSEPH ACEVEDO__, do hereby authorize and give permission to __DET. MERCADO__ who have identified themselves to me as Deputy Sheriffs of the MARTIN COUNTY SHERIFF'S OFFICE, to make a full and complete search of my __GALAXY S22 (SOS-240-7498__located at __800 SE MONTERREY RD, STUART__, Martin County, Florida. I have been advised by the above deputies that they are engaged in an investigation concerning a possible violation of __893. 03C2XA)4 TRAFFICKING COCAINE__ and do further authorize and give them permission to take from my __BLACK GALAXY S22__ any books, records, materials, objects, or other property which have or might have connection, value, or relevance with said investigation. This includes surveilling and documenting the scene located described above by use of photography and/or video through the use of manned aircraft or remotely piloted aerial vehicle (drone).

The above deputies have fully and fairly advised me of my rights as follows:

- That I have the right to refuse to consent to this search of my property and/or the taking of any property or thing located therein.
- That I have the right to consult with an attorney or any other person of my choice prior to giving this consent and permission to search the above described property.
- That any books, records, materials, object, or other property found by said deputies in the course of their search can be used against me in a court of law.

I fully understand and appreciate these rights and wish that it be specifically understood that I am hereby giving my consent and permission to search the described __GALAXY S22__ solely because of my desire to freely and voluntarily cooperate and assist in this investigation. I have not been promised anything or been threatened or coerced in any way, nor has any inducement of any kind been held out to me in return for this consent and permission to search.

Date: __12-02-22__   Time: __00:07__   Signed: __[signature]__

Witness Name (Printed) __ALEX MERCADO__   Witness Signature: __[signature]__

Witness Name (Printed) __Josh Miller__   Witness Signature: __[signature]__   __4116__

Govt. Ex. 2.

Detective Mercado filled out the blank spaces on the form except for the signature.  Mr.

Acevedo then signed the consent to search form.  DE 60 at 25, 61.  Detective Mercado asked Mr.

Acevedo for the 4-digit pin to access the cellphone, which Acevedo provided.  *Id*. at 64.  Detective

Mercado did not tell Mr. Acevedo that law enforcement was going to search his entire phone, *id*.,

but Detective Mercado testified that the purpose of searching the cell phone was to investigate

further about the incident that happened on December 1, 2022, as well as to verify the confidential

information Mr. Acevedo was willing to provide as an informant.  *Id*. at 33, 56-70.

<u>**ANALYSIS**</u>

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

no warrants shall issue, but upon probable cause.'"  *U.S. v. Batson*, 749 F. App'x 804, 806 (11th

Cir. 2018) (quoting U.S. Const. amend. IV).  "The Fourth Amendment does not proscribe all state-

initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v.

Jimeno*, 500 U.S. 248, 250 (1991) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990)).  The

Supreme Court has "repeatedly affirmed" that "the ultimate touchstone of the Fourth Amendment

is reasonableness."  *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014).

Here, Defendants' Motions raise three arguments for suppression.  First, both Defendants

argue the officers did not have reasonable suspicion or probable cause to stop the SUV, so the stop,

K-9 sniff, and subsequent search of the vehicle were unlawful.  DE 32, 35 at 3-6.  Second, Mr.

Acevedo argues he did not knowingly and voluntarily waive his *Miranda* rights, so evidence

stemming from his post-arrest statements should be suppressed.  DE 35 at 6-9.  Third, Mr. Acevedo

argues that he did not voluntarily consent to a search of his cell phone and the search that was

conducted exceeded the scope of the permission given for the search.  *Id.* at 9-12.  Mr. Acevedo

thus ask the Court to suppress all evidence stemming from the search of his phone.  The

Government responds that the stop and search of the SUV were supported by probable cause, and

Mr. Acevedo voluntarily waived his *Miranda* rights and voluntarily consented to a full search of

his cell phone.  Below, I will address the arguments in turn.

### 1.     The Officers had Probable Cause to Stop the SUV.

A traffic stop is a seizure within the meaning of the Fourth Amendment, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), but is constitutional if it is supported by probable cause to believe a traffic violation has occurred or is justified by reasonable suspicion in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968).  *U.S. v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008); *see also U.S. v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999).  Probable cause exists when, under the totality of the circumstances, there is a fair probability that illegal conduct has occurred.  *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989); *U.S. v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986).  The probable cause standard is objective, and the officers' subjective motives in executing a traffic stop are irrelevant.  *Whren v. U.S.*, 517 U.S. 806, 813 (1996); *see also Simmons,* 172 F.3d at 775.

Florida law provides: "Except when directed to proceed by a police officer or traffic control signal, every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop at a clearly marked stop line, but if none, before entering the crosswalk or ... the point nearest the intersecting roadway."  Fla. Stat. § 316.123(2)(a).  Thus, failing to stop at a stop sign is a traffic violation that provides a valid basis for a traffic stop.  *See, e.g., U.S. v. Allbritton*, 758 F. App'x 851 (11th Cir. 2019) (affirming district court's denial of defendant's motion to suppress, finding deputy that saw defendant roll through stop sign in violation of Florida Statute § 316.123(2)(a) had probable cause to stop defendant); *U.S. v. Simmons*, 172 F.3d 775 (11th Cir. 1999) (affirming district court's finding that there was "no question" that the officers had observed defendant run the stop sign and, therefore, had probable cause to stop defendant's automobile); *U.S. v. Senecharles*, 2015 WL 12910750 (S.D. Fla. May 11, 2015) (Torres, J.) (recommending denial of defendant's motion to suppress, finding officer's observation of defendant's car driving through a marked stop sign without attempting to slow down or apply its brakes demonstrated a clear traffic

violation under Florida law, and therefore the officers had probable cause to initiate the traffic stop), *R&R adopted,* No. 14-CR-20801 (DE 38) (S.D. Fla. May 15, 2015); *U.S. v. Sims*, 2019 WL 7879878 (S.D. Fla. Dec. 20, 2019) (Matthewman, J.) (recommending denial of defendant's motion to suppress, finding deputy had probable cause to believe several traffic infractions had occurred after witnessing defendant drive evasively and fail to stop at a stop sign), *R&R adopted,* 2020 WL 611909 (S.D. Fla. Feb. 10, 2020); *U.S. v. Lindsey,* 691 F. Supp. 3d 1370 (M.D. Fla. 2023) (finding officers had probable cause to stop defendant because they observed defendant fail to come to a complete stop at a stop sign in violation of Florida Statute § 316.123(2)(a)).  Additionally, "[o]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *U.S. v. Brooks*, 448 Fed. Appx. 27, 29 (11th Cir. 2011).

Here, the traffic stop was lawful because the SUV failed to stop at a stop sign.  I find Deputy Corley's testimony that he observed Defendants' SUV fail to come to a complete stop at the posted stop sign to be credible, plausible, uncontroverted, and trustworthy.  June 17 Tr. at 25. Although it was dark that night, the area was lit by streetlights, and Deputy Corley had an unobstructed view from under the overpass less than 180 yards away.  June 17 Tr. at 74-75, 146. There was nothing about Deputy Corley's demeanor on the stand that suggested deception or confusion; to the contrary, Deputy Corley's responses were clear and concise, and he not only remembered that the vehicle failed to stop, but also that it got into the westbound turning lane before making an eastbound turn.   Although there is no video evidence, a lack of video or audio recording is not reason, by itself, to find the officer's testimony not credible.

Defendant contends that the traffic stop was pretextual because the Interdiction Strike Force officers set up the fake checkpoint notice on I-95 for the express purpose of identifying

vehicles to search for drugs and contraband.  This argument is unpersuasive.  In *Whren*, the Supreme Court flatly rejected the idea that "the constitutional reasonableness of traffic stops depends on the actual motive of the individual officers involved."  *Whren*, 517 U.S. at 813.  As long as the circumstances, viewed objectively, justify the traffic stop, the officers' subjective motives do not strip them of their legal justification.  *Id.* at 812-13.  Based upon his observation, Deputy Corley had a reasonable belief that Defendant Rumowksi violated Florida's traffic laws by failing to stop at a stop sign.  As a result, the traffic stop was supported by probable cause and the officers lawfully stopped Defendants' vehicle.  Defendants' Motions on this basis should be denied.

### 2. The Officers Did Not Unlawfully Prolong the Traffic Stop to Conduct a Dog Sniff.

The duration of a traffic stop is limited to the time necessary to effectuate the purpose of the stop.  *U.S. v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999).  "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns."  *Rodriguez v. U.S.*, 575 U.S. 348, 354 (2015) (citations omitted).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.*  An officer does not unreasonably delay a traffic stop by engaging in inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Rodriguez*, 575 U.S. at 355.  But the traffic stop may not last any longer than the time necessary to process the traffic violation unless there is "articulable suspicion of other illegal activity."  *U.S. v. Holloman*, 113 F.3d 192, 196 (11th Cir. 1997).

Here, Deputy Corley's testimony and the CAD reports establish that the duration of the traffic stop was limited to the time necessary to process the traffic violation. The CAD report for December 21, 2022 shows that the SUV was stopped at 9:17 PM. *See* Govt. Ex. 23C at 2; June 17 Tr. at 121-132. Deputy Corley walked Loki around the vehicle while Deputy Ferreira was still running checks and writing a warning. June 17 Tr. at 52-53. By 9:38 PM, Det. Corley had found and reported the firearm to dispatch. *See* Govt. Ex. 23C at 2. Thus, an officer was still conducting checks and issuing a warning when the K-9 sniffed the vehicle and only 21 minutes passed between the stop of the vehicle and the discovery of the firearm. There is no evidence that the officers delayed processing the traffic citation or unlawfully prolonged the traffic stop in any way. *See U.S. v. Braddy*, 11 F.4th 1298, 1312 (11th Cir. 2021) (finding no unreasonable delay where "[p]rior to the sniff, no additional time was added to the traffic stop other than necessary for conducting the routine records check necessary for the issuance of and preparation of a traffic citation"). Thus, Defendants' Motions on this basis should be denied.

### 3.    The K-9's Positive Alert was Reliable and Provided Probable Cause to Search the SUV.

Probable cause to search a vehicle exists when a narcotics-trained dog alerts to the presence of drugs in the vehicle. *U.S. v. Dunkley*, 911 F.2d 522, 527 (11th Cir. 1990); *see also Braddy*, 11 F.4th at 1312. The Supreme Court has rejected a "strict evidentiary checklist" for assessing a K-9's reliability. *Florida v. Harris*, 568 U.S. 237, 244-45 (2013). A "probable-cause hearing focusing on a dog's alert should proceed much like any other," and the relevant inquiry is whether "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 247-48. Evidence of "a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 246. However, a defendant "must have

an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. *Id.* "The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty." *Id.* at 247. And even where "a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause, such as if the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id.* (citations and quotations omitted)).

Here, the evidence submitted at the suppression hearing established that Deputy Corley and K-9 Loki completed 480 hours of training to become certified by the Florida Department of Law Enforcement and by the Florida Law Enforcement K-9 Association. June 17 Tr. at 11-12, 108. They are re-certified annually. K-9 Loki is certified to track and apprehend humans, and to detect narcotics. *Id*. at 12-13. He is trained to detect cocaine, methamphetamine, heroin, and MDMA. *Id.* at 14. He is not trained to alert to marijuana.[7] *Id*. This evidence supports the conclusion that K-9 Loki's alert for narcotics on the vehicle reliably indicated the presence of cocaine, methamphetamine, heroin, or MDMA within the vehicle. Indeed, the officers found a half brick of cocaine in a backpack in the vehicle's rear compartment. Accordingly, I find that the officers had probable cause to search the vehicle based upon K-9 Loki's alert. *Harris*, 568 U.S. at 248 ("If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause."); *U.S. v. Young*, 2016 WL 11431025, at *4 (S.D. Fla. Nov. 8, 2016) (finding "dog was sufficiently qualified to detect the drugs in Defendant's car" where "the dog completed

---

[7] According to Deputy Corley, when Loki was purchased in 2019, MCSO stopped training its K-9s to alert to marijuana because of changes in the law regarding marijuana and hemp usage. Once hemp became legal, law enforcement did not want their K-9s alerting to marijuana odor since a positive alert might not constitute probable cause due to the hemp issue. To alleviate confusion, MCSO stopped training on marijuana as a target odor. June 17 Tr. at 106.

three months of narcotic detection training . . . [and] was certified in narcotics detection from the Florida Law Enforcement Canine Association.").

Mr. Rumowski argues that probable cause is lacking because Acevedo provided a medical marijuana card as identification, the officers were informed that Defendants were in the cannabis business before the search, and some of Loki's training reports suggest Loki may have alerted to marijuana in the past. DE 32 at 3. In support, he proffers deployment reports of Loki previously alerting to vehicles containing marijuana, June 17 Tr. at 85-90, and suggests that Loki may have been alerting to the odor of marijuana instead of cocaine in Defendants' vehicle on December 1, 2022.

The primary problem with this argument is that it was not borne out by the evidence adduced at the hearing. Deputy Corley testified that Defendants told him they were coming from an event in Miami; they did not say they were coming from a cannabis related event. Further, Deputy Corley testified that he did not learn Acevedo had a medical marijuana card until after the arrest. His testimony is uncontroverted, and I find it credible. Deputy Corley has established to my satisfaction that he had no knowledge of Defendants' cannabis business at the time of the K-9 sniff and Loki is not trained to alert to cannabis. Moreover, what was found in the vehicle was cocaine, not marijuana. Defendants' Motions on this basis should be denied.

**4.   Mr. Acevedo Knowingly and Voluntarily Waived his *Miranda* Rights.**

Next, Mr. Acevedo argues that he did not knowingly or voluntarily waive his *Miranda* rights. According to Mr. Acevedo, the totality of circumstances surrounding his "custodial interrogation demonstrates that he did not understand his *Miranda* rights and thus, did not execute a voluntary and knowing oral waiver of his rights." DE 35 at 9. However, the record evidence demonstrates otherwise.

Under the Fifth Amendment, "[n]o person ... shall be compelled in any criminal case to be a witness against himself ..." U.S. Const. Amend. V.  It is well established that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Before a person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him. *Id.* at 467-73.  Known as *Miranda* warnings, advice of these rights is "required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." *Endress v. Dugger*, 880 F.2d 1244, 1248 (11th Cir. 1989).  Custodial interrogation in this context means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.

Courts employ a two-prong inquiry to determine if a waiver was voluntary, knowing, and intelligent:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).  "A suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the

police." *Berghuis v. Thompkins*, 560 U.S. 370, 388-89 (2010).  To determine if statements were voluntary, the Court must examine the "totality of the circumstances, including the details of the interrogation and the defendant's characteristics."  *U.S. v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010); *see also U.S. v. Jones,* 32 F.3d 1512, 1516 (11th Cir. 1994) (determining "whether a confession is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice").  Factors to be considered include "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003).

Here, regarding the first prong, Detective Mercado clearly advised Mr. Acevedo of his *Miranda* rights by reading them verbatim from a law enforcement agency-approved card.  DE 60 at 17-18.  Mr. Acevedo acknowledged his understanding of those rights and voluntarily waived them.  *Id.* at 26.  This knowing and voluntary waiver was memorialized in an audio recording made at the time of the roadside encounter.  Specifically, the following recorded exchange took place:

> DETECTIVE MERCADO: Alright, man. No. Yeah. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer, for advice before we ask you any questions and to have him or her with you during questioning. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you wish. If you decide, to answer questions without a lawyer present you'll still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. You understand all that as I read that to you?
>
> MR. ACEVEDO: Yes, Sir.
>
> DETECTIVE MERCADO: Ok. Are you willing to talk to me?
>
> MR. ACEVEDO: Yeah, we can talk. What you wanna talk about?

Govt. Ex. 1.[8]  The above recorded statement and Detective Mercado's credible testimony confirm that the detectives spoke to Mr. Acevedo in a clear, calm, and conversational tone.  There is no indication that Mr. Acevedo did not understand his rights.  On the contrary, he unequivocally said he understood and went on to willingly talk with Detective Mercado and Agent Miller.  There was no coercion, intimidation, or deception of any sort.  Detective Mercado testified that he and Agent Miller never pointed their holstered firearms at Mr. Acevedo during the traffic stop or at any point while they were questioning Mr. Acevedo.  DE 60 at 17, 18, 28, 36.  Mr. Acevedo indicated that he understood his rights as they were read to him and agreed to speak with the detectives.  *Id.* at 18, *see also* Govt. Ex. 1 (Mr. Acevedo responding "yes sir" when Detective Mercado asked if he understood his *Miranda* rights).  Under the totality of the circumstances, Mr. Acevedo clearly understood his *Miranda* rights and made the uncoerced and knowing choice to waive them before answering the detectives' questions.

Regarding the second prong, Mr. Acevedo's post-*Miranda* statements were voluntary and not the result of police overreaching.  Mr. Acevedo had not been in law enforcement custody long when the *Miranda* rights were read to him.  The nature of the custodial interrogation was low key and lacking in coercion.  The questioning detectives used no physical force or intimidation tactics against Mr. Acevedo.  Further, there is no evidence that Mr. Acevedo did not understand the rights read to him.  Indeed, Mr. Acevedo expressed himself articulately throughout the entirety of the exchange.   Mr. Acevedo had sufficient opportunity and information to understand the rights he was waiving, and eagerly sought out an opportunity to cooperate with Detective Mercado and Agent Miller.

---

[8] Portions of the audio recording are unintelligible.  To aid in my review of this recording, I afforded counsel for each party the opportunity to provide me with a written transcript of the audio recording.  Both sides complied.  While the parties' transcripts differ slightly in certain respects, they are notably consistent regarding the very first part of the recorded encounter capturing the clear provision of *Miranda* rights to Mr. Acevedo.

Mr. Acevedo's challenge to the timing of his *Miranda* warnings is without evidentiary support. Mr. Acevedo's brief contends that Agent Miller began interrogating Mr. Acevedo before reading him his *Miranda* rights. DE 35 at 9. Specifically, Mr. Acevedo asserts that Agent Miller arrived after the search of the SUV, while Defendants were still standing outside of the police vehicles. *Id*. Mr. Acevedo argues Agent Miller approached him, was familiar with his criminal history, and insinuated that it would be in his best interest to cooperate with law enforcement.[9] *Id*. Mr. Acevedo did not take the stand and testify to these facts, however. Nor did either party call Agent Miller to the stand. Thus, the claims in Mr. Acevedo's brief are unsupported by evidence in this regard.

In addition, Mr. Acevedo's brief conflicts squarely with Detective Mercado's testimony. Detective Mercado testified at great length that Agent Miller was "next to [him] the whole time" and never mentioned any separate conversation as alleged by Mr. Acevedo. DE 60 at 14. According to Detective Mercado, when Detective Mercado spoke to the deputies and then to the Defendants, Agent Miller was right next to him. *Id*. at 10, 16. The timeline set out in Detective Mercado's testimony leaves no opportunity for Agent Miller to interrogate Mr. Acevedo before he was read *Miranda* rights.

Further, Detective Mercado testified he was unaware of any investigations or law enforcement incidences involving Mr. Acevedo, and there is no evidence that Detective Mercado or Agent Miller knew anything about Mr. Acevedo's criminal history before they interviewed him. *Id*. at 18 (Mercado testifying neither he nor Agent Miller "ran" Mr. Acevedo's information before interviewing him). Detective Mercado's testimony is bolstered by the audio recording of the

---

[9] Puzzlingly, Mr. Acevedo later argues "[b]efore [the] request [to search his cell phone] the agents did not know anything about Mr. Acevedo or his activities to warrant a more extensive search of his phone." DE 35 at 12. Mr. Acevedo argues that Agent Miller both knew and did not know about Mr. Acevedo's criminal history.

roadside encounter in evidence.  This recording makes clear that Detective Mercado read Mr. Acevedo *Miranda* rights at the outset of their roadside conversation.   There is no evidence supporting Mr. Acevedo's argument that Agent Miller began his interrogation before Detective Mercado read *Miranda* rights.

In all, the totality of the circumstances readily shows that Mr. Acevedo willingly talked to the detectives with a knowing awareness of his *Miranda* rights and after having made the uncoerced choice to waive them.

### 5. Mr. Acevedo Provided Voluntary Consent to Search his Galaxy S22 Cell Phone and the Officers Did Not Exceed the Scope of Permissible Search.

Lastly, Mr. Acevedo argues that he "did not voluntarily consent to a full search of his cell phone."  DE 35 at 12.  I disagree.

The Fourth Amendment protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  Where, as here, challenged searches are executed without a search warrant, the Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable under the Fourth Amendment.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *U.S. v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983). Warrantless searches are *per se* unreasonable, "subject only to a few specifically established and well-delineated exceptions.'"  *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. U.S.*, 389 U.S. 347, 357 (1967)).

A warrantless search pursuant to voluntary consent is an exception to the warrant requirement.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); *U.S. v. Thomas*, 818 F.3d 1230, 1239-40 (11th Cir. 2016) ( "a warrantless search is lawful when a person with actual or apparent authority voluntarily consents

to law enforcement officers conducting a search"); *U.S. v. Whaley*, 415 F. App'x 129, 133 (11th Cir. 2011) (per curiam) ("A [search] warrant is not needed ... if the defendant voluntarily consents to the search.").  Consent to conduct a search is voluntary if it is the product of an "'essentially free and unconstrained choice.'"  *U.S. v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting *Schneckloth*, 412 U.S. at 225).  Voluntariness of consent depends on the totality of the circumstances.  *Id.*  In evaluating voluntariness, courts are directed to examine several factors, including "the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found."  *Id.*  The determination of consent must be conducted on a case-by-case basis.  *U.S. v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989) (citing *Schneckloth*, 412 U.S. at 226-27).

Based upon the testimony and evidence presented at the hearing, I find that Mr. Acevedo voluntarily told the detectives where his cell phone was located and voluntarily consented to its search.  At the station, Detective Mercado asked "[d]o you mind if we search your phone" and Mr. Acevedo responded "[y]eah sure." DE 60 at 57.  Defendant signed a consent to search form that was clear in its terms.  Govt. Ex. 2.  In relevant part, the signed form stated as follows:

> I, Joseph Acevedo, do hereby authorize and give permission to Det. Mercado who have[sic] identified themselves to me as Deputy Sheriffs of the MARTIN COUNTY SHERIFF'S OFFICE, to make **a full and complete** search of my Galaxy S22 located at 8200 SE Monterey Rd, Stuart, Martin County, Florida.

*Id.* (emphasis added).

Regarding voluntariness, I turn to consideration of the applicable factors.  First, the audio recording of the police encounter demonstrates no evidence of any coercive police procedure.  *See U.S. v. Drayton*, 536 U.S. 194, 204 (2002) (no coercion when "there was no application of force,

no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice"). Detective Mercado spoke to Mr. Acevedo calmly. *See* Govt. Ex. 1. The consent form Mr. Acevedo signed confirmed this lack of coercion in verifying that: "I have not been promised anything or been threatened or coerced in any way, nor has any document of any kind been held out to me in return for the consent for permission to search my phone." Govt. Ex. 2. Further evidencing the lack of coercive police procedure is the fact that when Mr. Acevedo was taken to the interview room, his handcuffs were removed, and he was offered water. DE 60 at 23. Weapons were never drawn.

Second, regarding cooperation, Mr. Acevedo was invariably cooperative with the detectives. Mr. Acevedo freely indicated that he did not mind talking to the detectives. *Id.* at 25-26. Further, Mr. Acevedo readily signed the clearly worded consent to search form. *Id.* 61. Detective Mercado explained the consent to search form and gave Mr. Acevedo the time to read it. *Id.* at 33. The form was clear about its terms and indicated that the consent to search the cell phone was based on Mr. Acevedo's "desire to freely and voluntarily cooperate and assist in this investigation." Govt. Ex. 2. Consistent with this statement, much of Detective Mercado and Agent Miller's discussion with Mr. Acevedo centered on Mr. Acevedo's past cooperation with law enforcement and his desire to presently cooperate in an effort to be released. *Id.* at 24-25, 33.

Third, regarding Mr. Acevedo's awareness of his right to refuse consent, Detective Mercado gave Mr. Acevedo the opportunity to read the form. *Id.* at 33:13-14. The consent form unequivocally stated: "I have the right to refuse to consent to this search of my property and/or the taking of any property or thing located therein." Govt. Ex. 2. Mr. Acevedo read the form and signed it. DE 60 at 57-58. The form included language that authorized law enforcement "to make

a full and complete search of [Mr. Acevedo's] Galaxy S22…"  Govt. Ex. 2.  These circumstances demonstrate that Mr. Acevedo was fully aware of his right to refuse consent.

Fourth, regarding Mr. Acevedo's intelligence, there is no evidence that he had any limitations that would have vitiated his consent.  Mr. Acevedo does not argue that he has any physical limitation or mental health issues that could have affected the voluntariness of his consent. Further, the audio recording in evidence confirms Mr. Acevedo can hold lucid and dynamic conversations.  Govt. Ex. 1.  Finally, even if Mr. Acevedo believed or knew that incriminating evidence would be found, he nonetheless willingly and voluntarily consented to the search and seizure of his phone.  In all, the factors overwhelmingly favor a finding of Mr. Acevedo's voluntary consent to seize and search his cell phone.

Mr. Acevedo also argues that his cell phone had already been searched by the time he was read his *Miranda* rights.  DE 35 at 12.  There is no evidence supporting this.  Detective Mercado read Defendant his *Miranda* rights at the beginning of the roadside encounter and there is no indication that either Detective Mercado or Agent Miller searched the cell phone prior to that time. In fact, Detective Mercado testified that the first time anyone connected to law enforcement looked at Mr. Acevedo's phone was when Agent Miller did a cell phone "dump" back at the police station, which was well after the roadside encounter where the *Miranda* rights were given.  DE 60 at 49.

Mr. Acevedo suggests that the search of his cell phone exceeded the scope of his permission to search only for information limited to the day of his arrest, December 1, 2022.  DE 35 at 12. Mr. Acevedo argues that before the officers requested to see his cell phone, they "did not know anything about Mr. Acevedo or his activities to warrant a more extensive search of his phone."  *Id*. I am entirely unconvinced.  There is no evidence showing that Mr. Acevedo placed any limitation on the scope of the search.  "The scope of a defendant's consent is judged according to a standard

of objective reasonableness.  The question is what a police officer could reasonably interpret the consent to encompass." *Whaley*, 415 F. App'x at 133 (internal citations and quotations omitted); *see also U.S. v. Megahed*, 2009 WL 722481, *2 (M.D. Fla. Mar. 18, 2009) (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).  Applying this objective reasonableness standard, it was reasonable for the investigating detectives to have understood that Mr. Acevedo consented to an unrestricted search of his cell phone.  Detective Mercado testified about Mr. Acevedo's consistent attempts to provide information from before his arrest date in order to become a confidential informant.  DE 60 at 64-65.  To assess Mr. Acevedo's credibility as a potential confidential informant, information prior to his arrest date became relevant to law enforcement's search of the cell phone.  Further, the signed consent to search form contains no express limitation or indication that the cell phone search was somehow limited to data from Mr. Acevedo's single date of arrest. *See* Govt. Ex. 2.  To the contrary, the form authorizes MCSO "to make **a full and complete** search of [Defendant's] Galaxy S22" cell phone.  Govt. Ex. 2 (emphasis added). Mr. Acevedo never explicitly stated or otherwise indicated that his consent was limited to information from December 1, 2022.  DE 60 at 36:4-8.  I thus find that the officers did not exceed the scope of Mr. Acevedo's consent to search the cell phone.

## RECOMMENDATION

Based on the foregoing, I respectfully recommend that both Motions to Suppress, DE 32, DE 35, be **DENIED** in their entirety.

## NOTICE OF RIGHT TO OBJECT
## AND SHORTENED OBJECTIONS PERIOD

In light of the swiftly-approaching trial date, as agreed to by counsel for all parties, I find it necessary and appropriate to shorten the time for any objections pursuant to Southern District of Florida Magistrate Judge Rule 4(a).  Accordingly, the parties shall have SEVEN (7) DAYS from

the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District Judge Donald L. Graham. *See* 28 U.S.C. § 636(b)(1)(C); S.D. Fla. Mag. J. R. 4(a).  Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).  **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within three (3) days of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 28th day of June, 2024.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE